[Civ. No. 53409. First Dist., Div. Three. Feb. 15, 1983.]

CITY OF SANTA CLARA, Plaintiff and Respondent, v.
LOCAL AGENCY FORMATION COMMISSION OF
SANTA CLARA COUNTY, Defendant and Appellant.

COUNSEL

Selby Brown, Jr., County Counsel, Thomas William Cain and Don Fallon, Deputy County Counsel, for Defendant and Appellant.

Edwin J. Moore, City Attorney, Michael R. Downey, Assistant City Attorney, and Barry F. McCarthy, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

**BARRY-DEAL, J.**—The Santa Clara County Local Agency Formation Commission (hereafter LAFCO)[1] appeals from a judgment granting the City of Santa Clara's (hereafter the City) petition for writ of mandate compelling LAFCO

---

[1] Hereafter, we shall refer to the Santa Clara Local Agency Formation Commission, and to such commissions generally, as LAFCO. The meaning will be clear from the context. (See *City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 386 [142 Cal.Rptr. 873].)

to set aside its order denying the City's petition for annexation of two parcels of undeveloped land. We reverse because LAFCO properly determined that the annexation was not exempt from the requirements of the California Environmental Quality Act (hereafter CEQA) and because it was within LAFCO's discretion to adopt a policy of discouraging annexation of territory prezoned for agricultural use exclusively.

## STATEMENT OF THE CASE AND OF THE FACTS

On May 7, 1980, the City applied to LAFCO for annexation of two parcels of territory pursuant to the District Reorganization Act of 1965 (Gov. Code, § 56000 et seq.). The parcels, known as Agnew No. 33 and Homestead No. 47, contained 42.93 and 39.72 acres, respectively. The City proposed that the parcels be annexed to it and detached from the Central Fire Protection District, the chief reason being the City's desire to eliminate islands of unincorporated territory within its urban services area. The present use of each parcel was specified as "agricultural . . . with residences." Agnew No. 33 was being used for dairy cattle and grain crops and had 10 inhabitants; Homestead No. 47 was being used for orchards and had 7 inhabitants. The City had prezoned each parcel "A-agricultural" in 1956. No development was proposed as to either. The owners of the property comprising Agnew No. 33 stated that they did not object to annexation, but with the understanding that when the property was annexed it would have the same zoning as currently existed. The owners of Homestead No. 47 consented to the proposal without apparent reservation. The applications stated that the annexations were exempt from the provisions of CEQA.

On June 2, 1980, Alan LaFleur, senior staff analyst for LAFCO, submitted his report to LAFCO recommending that the proposals be continued pending environmental studies. He reasoned as follows. Although both properties had been prezoned "agricultural," the City's current general plan indicated that Agnew No. 33 was designated for medium density residential use and Homestead No. 47 for light industrial development. Because prezoning was inconsistent with the general plan designations, the proposals were deemed not categorically exempt from CEQA. Since LAFCO is required to consider environmental impact of annexations, a continuance was necessary while environmental data were assessed.

At the LAFCO meeting of June 11, 1980, Paul Sagers, LAFCO assistant executive officer, summarized the staff position regarding the annexations. Sam Cristofano, the City's director of public works and City engineer, presented the City's position. The matter was continued to July 2, 1980, at which time Olney Smith, City director of planning and inspection, stated that the City had provided all of the environmental information that it could (namely, none), since there

were no present plans to develop the property. LAFCO then denied the applications without prejudice.

On October 11, 1980, the City petitioned the superior court for a writ of mandate asking the court to set aside LAFCO's denial of its applications. The City argued that the annexations were exempt from the requirements of CEQA and that LAFCO had not complied with its statutory mandates when it failed to consider appropriate factors in passing upon the application and when, as a matter of policy, it set improper limits upon annexations.

LAFCO answered the petition, and after the matter was extensively briefed and was argued, the court found that the annexations were exempt from the requirements of CEQA and that LAFCO did not have authority to adopt a policy against annexation of agricultural lands. The court issued findings of fact and conclusions of law on March 12, 1981. On the same day it entered judgment ordering that peremptory writ of mandate issue directing LAFCO to set aside its order, rehear the applications, and determine that the annexations were exempt from CEQA requirements. This appeal followed.

Other pertinent facts are developed in the discussion.

## DISCUSSION

██ ██ ██ ██ LAFCO contends that the trial court erred in issuing[2] the writ of mandate[3] because, in denying the proposals for annexation, LAFCO complied with its legislative mandate and because the proposals were not categorically exempt from the requirements of CEQA. We agree.

### The Legislative Scheme

The legislative history and the function of LAFCOs and CEQA have been treated elsewhere and need not be repeated in detail here. (See, e.g., *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 273-274 [118 Cal. Rptr. 249, 529 P.2d 1017]; Note (1976) 16 Santa Clara L.Rev. 403, 404-405; *City of Santa Cruz* v. *Local Agency Formation Com., supra,* 76 Cal.App.3d at pp. 385-386; Review of Selected 1965 Code Legislation (Cont.Ed.Bar 1965)

---

[2] The record before us contains neither a peremptory writ of mandate nor any indication that one was ever issued or served. In cases such as this the function of the judgment is to order that the writ issue and to dispose of the question of costs. The additional step of actually issuing and serving the writ is often overlooked. (See *City of Carmel-By-The-Sea* v. *Board of Supervisors* (1982) 137 Cal.App.3d 964, 970, fn. 4 [187 Cal.Rptr. 379].)

[3] LAFCO's annexation decisions are quasi-legislative in nature, and therefore judicial review of those decisions is by ordinary mandamus (Code Civ. Proc., § 1085), not by administrative mandamus (Code Civ. Proc., § 1094.5). (*City of Santa Cruz* v. *Local Agency Formation Com., supra,* 76 Cal.App.3d at pp. 387, 390, cited with approval in *Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 848-849 [171 Cal.Rptr. 619, 623 P.2d 180].)

pp. 140-141.) LAFCOs as they exist today are the product of the Knox-Nisbet Act of 1965, the purposes of which include "the discouragement of urban sprawl," the "orderly formation and development of local governmental agencies," and the encouragement and planning of "well-ordered, efficient urban development patterns with appropriate consideration of preserving open-space lands within such patterns." (Gov. Code, §§ 54774, 54774.5.) To these ends, each LAFCO has the power to establish "spheres of influence" of each local governmental agency within its county[4] and to approve or disapprove, inter alia, proposals for annexation of territory to local governmental agencies. (Gov. Code, §§ 54774, 54790, subd. (a).)

▇ The purpose of CEQA, which was enacted in 1970, is, generally speaking, to protect the environment. (Pub. Resources Code, §§ 21000, 21001.) The Legislature intended that CEQA " '. . . be interpreted in such manner as to afford the *fullest possible protection* to the environment within the reasonable scope of the statutory language.' " (*Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d at p. 274, quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], italics added by *Bozung* court.)

CEQA requires "governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality." (Pub. Resources Code, § 21001, subd. (f).) An essential provision which implements CEQA's purposes is the requirement that local agencies prepare and certify an environmental impact report (EIR) "on any project they intend to carry out or approve which may have a significant effect on the environment. . . ." (Pub. Resources Code, § 21151; see Pub. Resources Code, §§ 21002, 21002.1.) ▇ A LAFCO is a governmental local agency, and an annexation to a city is a project within the meaning of CEQA. (*Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d at pp. 276-279.)[5] Therefore, before approving an annexation which may have a significant effect on the environment, a LAFCO must prepare and certify an EIR. (*Id.*, at pp. 279-287.)

The *Bozung* decision has been cited for the proposition that *all* annexation proposals require preparation of an EIR. (E.g., Note, *supra*, 16 Santa Clara L.Rev. at p. 412.) This is not correct. The land to be annexed in that case was slated for development in the "near future," and this fact was considered "[v]ital" by the court in reaching its decision. (*Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d at pp. 269-270.) An EIR is only required for a

---

[4]Government Code section 54774 defines "sphere of influence" as meaning "a plan for the probable ultimate physical boundaries and service area of a local governmental agency." (See 63 Ops.Cal.Atty.Gen. 758 (1980).)

[5]Similarly, an amendment by a LAFCO to a sphere of influence is a project within the meaning of CEQA. (63 Ops.Cal.Atty.Gen. 758, *supra*.)

project which may have a significant effect on the environment, that is, "a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068.)

### Categorical Exemption

CEQA exempts a number of projects from the requirement that an EIR be prepared because by definition they do not have a significant effect on the environment. (E.g., Pub. Resources Code, § 21080.) The guidelines for implementation of CEQA (Cal. Admin. Code, tit. 14, § 15000 et seq.), promulgated by the state Office of Planning and Research pursuant to authority of Public Resources Code section 21083, contain the following provisions relevant to our discussion.

California Administrative Code, title 14, section 15100, provides: "Section 21084 of the Public Resources Code requires these Guidelines to include a list of classes of projects which have been determined not to have a significant effect on the environment and which shall, therefore, be exempt from the provisions of the Environmental Quality Act of 1970. [¶] In response to that mandate, the Secretary for Resources has found that the following classes of projects listed in this article [article 8—categorical exemptions] do not have a significant effect on the environment and they are declared to be categorically exempt from the requirement for the preparation of environmental documents." There follows a series of provisions establishing 29 "classes" of categorical exemption. We are here concerned with subdivision (a) of class 19, provided for in California Administrative Code, title 14, section 15119: "Class 19 consists of only the following annexations:

"(a) Annexations to a city or special district of areas containing existing public or private structures developed to the density allowed by the current zoning or pre-zoning of either the gaining or losing governmental agency whichever is more restrictive, provided, however, that the extension of utility services to the existing facilities would have a capacity to serve only the existing facilities.

". . . . . . . . . . . . . . . . . . . . ."

In its applications the City claimed that both annexations here in question were categorically exempt under this provision, and the trial court agreed. Our review of the record reveals that there was very little evidence of substance presented on this question and that the evidence which was presented only supported the conclusion that the annexations did not come within class 19. At the LAFCO hearing of June 11, 1980, Sam Cristofano, director of public works for the City, conceded "that when both of these properties come in and redevelop

simply by virtue of their size and the existing land use *there is going to be some impact . . . .''* At the LAFCO hearing of July 2, 1980, Olney Smith, City director of planning and inspection, stated, "Although they are not developed parcels they do have all the City services and are surrounded by the City services and utilities in the area." The clear inference is that some time within the foreseeable future after annexation utility services would be extended into the parcels and that these services would have a capacity to serve more than the presently existing farmhouses. It follows that the finding of exemption under class 19 was not supported by the evidence and cannot stand.

In any event, the evidence showed that even if the annexations came within the description of class 19 categorical exemptions, that is, that they were developed to the maximum permissible density and extension of utility services would only have the capacity to serve the existing facilities, it was error for the trial court to find exemption. California Administrative Code, title 14, section 15100.2, subdivision (c), provides: "Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." As will become apparent from the discussion which follows, this provision supported LAFCO's position that these annexations should not be exempted under class 19. Of course, it does not necessarily follow from lack of categorical exemption that a project is not exempt from CEQA. EIRs are not required for "[m]inisterial projects." (Pub. Resources Code, § 21080, subd. (b)(1).) Ministerial projects, generally speaking, are those over which the public agency has no discretion. (Cal. Admin. Code, tit. 14, § 15032.) The categorical exemptions apply only to nonministerial, that is, discretionary projects. (Cal. Admin. Code, tit. 14, § 15100.1.) Thus, those discretionary projects which are not categorically exempt will require an EIR if they have a significant effect on the environment.

### *LAFCO's Discretion*

LAFCOs are empowered to "review and approve or disapprove with or without amendment, wholly, partially, or conditionally, proposals for . . . [t]he annexation of territory to local agencies, . . ." (Gov. Code, § 54790, subd. (a)(3).) Among the factors which LAFCO must consider in review of a proposal are a number of environmental elements such as "population density[,] . . . topography, . . . the likelihood of significant growth in the area . . . during the next 10 years[,] . . . effect of the proposed action and of alternative actions, on adjacent areas, . . . [and] [c]onformity with appropriate city or county general and specific plans." (Gov. Code, § 54796.)

As we stated above, LAFCO must comply with CEQA and therefore must prepare an EIR if an annexation under consideration, which is not categorically

exempt, will have a significant effect on the environment. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263.)

Government Code section 54790, subdivision (b), vests LAFCOs with the power and duty "[t]o adopt standards and procedures for the evaluation of proposals, including standards for each of the factors enumerated in Section 54796."

Pursuant to this authority, Santa Clara LAFCO adopted "Environmental Impact Review Procedures and Guidelines" (hereafter cited as Procedures and Guidelines) in February 1977. These Procedures and Guidelines are in accordance with the CEQA guidelines in their provision of this guiding principle: "It is the policy and intent of the Santa Clara County Local Agency Formation Commission to encourage and support the principle that environmental assessment of projects and their underlying activities should occur *as early in the planning process as possible* in an effort to define environmental constraints and opportunities in the project design stages." (Procedures and Guidelines, *supra,* ch. V, art. A, p. 7; see Cal. Admin. Code, tit. 14, § 15013, subd. (b); *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 282.)

Also apparently pursuant to the authority of Government Code section 54790 and in accordance with this principle of early environmental assessment, on October 5, 1977, LAFCO adopted the following policy: "Annexation of territory to a city, where said territory is prezoned agricultural but there may be an ultimate intended urban use, is discouraged because it promotes urban sprawl, violates the intent of the Knox-Nisbet Act, the California Environmental Quality Act, and the California Supreme Court's decision in *Bozung* vs. Ventura LAFCO."

In a letter dated October 11, 1977, LAFCO explained that this declaration of policy was the result of LAFCO being confronted with an annexation proposal in a context similar to that here under consideration: that is, a city applied for annexation of property which it had prezoned agricultural but which, according to an application to amend its general plan, was slated for different ultimate urban use. The letter explains that LAFCO adopted the above quoted policy because of the following considerations: (1) The city's environmental document (a negative declaration pursuant to Pub. Resources Code, § 21080) dealt only with the prezoned use, not the ultimate use of the property. (2) CEQA required the lead agency (that is, the agency which is responsible for the project and is preparing the environmental documents [Pub. Resources Code, § 21067; Cal. Admin. Code, tit. 14, § 15064]), which was the city, to consider the ultimate use of the property in its environmental review; when the city did not do so, LAFCO, as the "[r]esponsible agency" (Pub. Resources Code, § 21069), should question the validity of the lead agency's environmental documents. (3)

Prezoning of a territory to a use which is different from the intended use directly violates the intent of the Knox-Nisbet Act, CEQA, the *Bozung* decision, and LAFCO's procedures, since the environmental consequences of the proposed project are not brought to light at the earliest possible point in the project approval process. If all cities proposed annexations in this manner, LAFCO's *regional* environmental review would become impossible. (4) Annexation of parcels without stated intentions of urban use is premature and encourages urban sprawl. If there is no intended urban use, there is no need to annex. In reviewing a proposed annexation, LAFCO is required to consider the need for organized community services and the impact of the proposal on agriculture and open-space lands. When these factors are considered, annexation of agricultural/open-space lands with no intended urban use should be discouraged.

The letter closed with the observation that if territory proposed for annexation is prezoned agricultural, though a different (urban) use is shown in the city's general plan, once property is annexed it could be rezoned, and the LAFCO regional environmental review would have been omitted.

The trial court found that adoption of this policy was beyond LAFCO's authority. Our review of the pertinent statutes and policies which we have discussed above convinces us that the court was in error. We find that LAFCO's policy is consistent with its statutory mandate and that its explanation of that policy is an apt interpretation of legislation and decisional law.

Abundant support for the policy and its rationale is found in the Supreme Court's *Bozung* decision, wherein the court emphasized that CEQA mandates governmental agencies " 'at all levels' " to consider environmental factors "at the earliest possible stage." (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 282.) The court stressed the critical role of LAFCO's "knowledge of the regional setting" and the fact that LAFCO is "better qualified" than an annexing city to prepare and evaluate an EIR. (*Id.,* at p. 283.) Although the *Bozung* court was addressing a factual setting wherein development was anticipated in the near future (*id.,* at p. 270), the rationale of that decision applies with equal force where, as here, LAFCO is confronted with annexation of land which is prezoned agricultural but which it must assume will be developed within the foreseeable future because of the annexing city's general plan. This is particularly true in light of the requirement that LAFCO consider the likelihood of significant growth in the area during the next 10 years and conformity with the appropriate general plans. (Gov. Code, § 54796.)

It follows that, even if the annexations came within the description of a class 19 categorical exemption, the "unusual circumstances" of the inconsistency

between the prezoning and general plan removed the proposals from that exemption. (Cal. Admin. Code, tit. 14, § 15100.2, subd. (c).)

It also follows that as a matter of intelligent regional planning, and regardless of CEQA, the adoption of the policy of October 5, 1977, was an appropriate exercise of LAFCO's powers and duties. We note that it was also consistent with a subsequent amendment of Government Code section 54790, enacted in 1980, which provides: "When the development purposes are not made known to the annexing agency, the annexation shall be reviewed on the basis of the adopted plans and policies of the annexing agency." (Stats. 1980, ch. 1145, § 2, p. 3705.)[6]

The judgment is reversed, and the trial court is directed to deny the petition for writ of mandate.

Scott, Acting P. J., and Feinberg, J., concurred.

A petition for a rehearing was denied March 11, 1983, and respondent's petition for a hearing by the Supreme Court was denied April 13, 1983.

---

[6]We also note that Government Code section 54790 was amended in 1981 to provide that in regard to annexation of territory to cities, LAFCO "shall not have the power to disapprove an annexation, initiated by resolution, of contiguous territory which the commission finds is either (1) surrounded or substantially surrounded by the city to which the annexation is proposed or by such city and a county boundary or the Pacific Ocean if the territory to be annexed is substantially developed or developing, is not prime agricultural land as defined in Section 35046, and is designated for urban growth by the general plan of the annexing city or, (2) located within an urban service area which has been delineated and adopted by mutual agreement of a commission and a city, which is not prime agricultural land, as defined in Section 35046 and is designated for urban growth by the general plan of the annexing city." (Stats. 1981, ch. 855, § 3, p. 3283.) (See also the concurrent amendment to Gov. Code, § 35150, to the same effect. [Stats. 1981, ch. 855, § 1.5, p. 3280].)

This legislation did not become effective until January 1, 1982, and therefore was inapplicable to the proposals now under consideration. Furthermore, it is clear that the annexations in question did not come within either of the two categories described in the amendment. As to category (1), the property is not developed or developing. Regarding category (2), the territory could not be described as coming within the City's "urban service area," since that concept was not codified until January 1, 1982. (Stats. 1981, ch. 855, § 1, p. 3280, adding § 35051 to the Gov. Code.) Finally, as to the latter category, the evidence in the record before us indicates that the City was not currently servicing the area and that if it planned to do so within the next five years, this was not pursuant to mutual agreement between the City and LAFCO. Therefore, the property to be annexed apparently was not within the City's "urban service area." (Gov. Code, § 35051.)